Benjamin SPOCK et al., Appellants,

v.

Bert A. DAVID, Commander, Fort Dix Military Reservation, and Melvin Laird, Secretary of Defense.

No. 72–1934.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Oct. 17, 1972.

Decided Oct. 27, 1972.

David Kairys, Kairys & Rudovsky, Philadelphia, Pa., for appellants.

Richard W. Hill, Asst. U. S. Atty., Trenton, N. J., for appellees.

Before GIBBONS and JAMES RO-SEN, Circuit Judges, and LAYTON, District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal authorized by 28 U. S.C. § 1292(a)(1) from an order of the district court, 349 F.Supp. 179, refusing a preliminary injunction. It is before this panel as a result of the appellants' motion for an injunction pending appeal pursuant to Rule 8(a), Fed. R.App.P. or in the alternative for expedited consideration of the appeal. We granted the alternative motion for expedited consideration and the case was submitted without oral argument pursuant to Local Rule 12(6).

The appellants, plaintiffs below, are in two categories. Spock and Hobson are, respectively, candidates of the People's Party for President and Vice President of the United States in the election to be held on November 7, 1972. Jenness and Pulley are, repectively, the candidates for President and Vice President of the Socialist Workers Party. That organization, a national political party, is also a plaintiff. The Socialist Workers Par-

ty, Spock, Hobson, Jenness and Pulley, will be referred to collectively as the candidates. Ginaven, Misch, Hardy, and Stanton are individual political activists who in the past have distributed leaflets within the Fort Dix Military Reservation, in New Jersey, and who have, as a result of that activity received from the Commanding Officer of that base letters ejecting them from Fort Dix and barring their reentry. These bar orders are enforced by the sanction of 18 U.S. C. § 1382.[1] Ginaven, Misch, Hardy and Stanton will be referred to collectively as the barred pamphleteers. The appellee David is the Commanding Officer of the Fort Dix Military Reservation, and the appellee Laird is the Secretary of Defense. On September 29, 1972, the candidates and the barred pamphleteers filed a one count complaint seeking injunctive relief in aid of the exercise of claimed first amendment rights both before and after the 1972 election.

. The candidates alleged that on September 9, 1972, they had written a joint letter to David advising him of their intent to enter Fort Dix on September 23, 1972, for the purpose of distributing campaign literature and of holding a meeting to discuss election issues with service personnel and their dependents. The letter expressed their willingness to confine their campaigning to such times and places as might be designated by David. On September 18, 1972, David replied by a letter which advised the candidates that their request to visit Fort Dix and campaign was denied. The letter referred to Fort Dix Regulation No. 210–26[2] which, he said, prohibits political speeches and similar activities on all of the Fort Dix Military Reservation. It also referred to Fort Dix Regulation No. 210–27[3] which, he said, prohibits the distribution of literature without the prior approval of headquarters. The letter also advised that any person entering Fort Dix for the purposes prohibited by Regulations 210–26 and 210–27 would violate 18 U.S.C. § 1382. On September 23, 1972, candidates Spock and Pulley went to Fort Dix, where an officer acting on David's behalf refused to admit them to the base and prevented their entrance.

The barred pamphleteers each alleged that at various times in the past each was peacefully distributing literature on the base, each was taken into custody and ejected from the base, and each received a letter barring him from the military reservation in the future and warning that reentry might constitute a violation of 18 U.S.C. § 1382.

With the complaint was filed a motion for a preliminary injunction, an expedited hearing and an order to show cause. The district court issued an order directing the defendants to show cause on October 6, 1972, why a preliminary injunction should not be issued. On October 4, the United States Attorney filed three affidavits in opposition to the pre-

---

1. "Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or

Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—

Shall be fined not more than $500 or imprisoned not more than six months, or both."

2. "2. PROHIBITED PRACTICES:
a. Demonstrations, picketing, sit-ins, protest marches, political speeches and similar activities are prohibited and will not be conducted on the Fort Dix Military Reservation."

3. "3. PROHIBITED PRACTICES:
a. The distribution or posting of any publication, including newspapers, magazines, handbills, flyers, circulars, pamphlets or other writings, issued, published or otherwise prepared by any person, persons, agency or agencies other than those set forth in paragraph 2, above, and paragraph 5, below, is prohibited on the Fort Dix Military Reservation without proper written approval of the Adjutant General, this headquarters."

liminary injunction and a motion pursuant to Fed.R.Civ.P. 20(b) for an order severing the candidate plaintiffs from the barred pamphleteer plaintiffs. No answer has been filed, and the district court has not yet ruled upon the severance motion. An evidentiary hearing was held on the return day of the order to show cause, and on October 12, 1972, the district court filed an opinion denying the application for a preliminary injunction. An order to that effect was signed on October 13, 1972, and this appeal followed.

## JURISDICTION

■ We are confronted at the outset with the appellees' contention that the appeal should be dismissed for lack of federal jurisdiction. The district court opinion states, without discussion, that the allegations of the complaint are sufficient to establish jurisdiction under 28 U.S.C. § 1331. The jurisdictional statement of the complaint refers to 28 U.S. C. §§ 1331, 1343 and 1361, and to several other federal statutes [4] of a non-jurisdictional character. 28 U.S.C. § 1343 is inapplicable. It deals only with state action. This case involves actions taken solely on federal authority. 28 U.S.C. § 1361 is one of the grants of federal jurisdiction to which no jurisdictional amount is attached. But by no fair reading could the complaint be construed as alleging an action in mandamus to compel David and Laird to perform a duty owed to the plaintiffs. Under plaintiffs' theory in the complaint defendants are acting outside of their authority. It sets forth a suit in equity for an injunction against interference with civil rights protected by the first amendment. The only basis for federal jurisdiction is the general grant of federal question jurisdiction found in 28 U.S.C. § 1331, and to that grant Congress has attached a jurisdictional amount. *See* Lynch v. Household Fi-

nance Corp., 405 U.S. 538, 547, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). The complaint does contain the allegation that the matter in controversy exceeds the sum of $10,000.00 exclusive of interest and costs, but that mere allegation does not end the inquiry. *E. g.,* Tanzymore v. Bethlehem Steel Corp., 457 F.2d 1320 (3d Cir. 1972); Nelson v. Keefer, 451 F.2d 289 (3d Cir. 1971).

It may seem incongruous that if a state officer such as the Commanding Officer of a National Guard base were charged with violations of first amendment rights there would be federal jurisdiction regardless of jurisdictional amount, *see* Lasher v. Shafer, 460 F.2d 343 (3d Cir. 1972), but that when a federal officer is so charged the plaintiff must assume the added burden of establishing that the matter in controversy exceeds the sum or value of $10,000.00. Some courts and commentators have suggested that Congress cannot constitutionally require that more than $10,000.-00 be in controversy if the effect is to bar any federal judicial review of a constitutional claim. *See* Cortright v. Resor, 325 F.Supp. 797, 808–811 (E.D.N. Y.), rev'd *on other grounds,* 447 F.2d 245, 250–251 (2d Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972); Murray v. Vaughn, 300 F.Supp. 688, 695 (D.R.I.1969); Note, The Constitutional Implications of the Jurisdictional Amount Provision in Injunction Suits Against Federal Officers, 71 Colum.L.Rev. 1474 (1971); *cf.* West End Neighborhood Corp. v. Stans,[5] 312 F. Supp. 1066, 1068 (D.D.C.1970). *Compare* the above *with* Goldsmith v. Sutherland, 426 F.2d 1395 (6th Cir.), cert. denied, 400 U.S. 960, 91 S.Ct. 353, 27 L. Ed.2d 270 (1970). That view, however, is hardly consistent with the history of federal question jurisdiction. The lower federal courts had no general federal question jurisdiction until the Judiciary Act of 1875. Prior to 1875 the enforce-

---

4. 5 U.S.C. § 701 et seq.; 42 U.S.C. § 1972.

5. While the District Court for the District of Columbia is an article III court, 28

U.S.C. §§ 88, 132, it also has the jurisdictional attributes of a state court. *See* 2A Moore, Federal Practice ¶ 8.07 [3], at 1640 (2d ed. 1968).

ment of the Bill of Rights was the responsibility of the state courts, subject only to review of their decisions by the Supreme Court. When the lower federal courts were first granted federal question jurisdiction a jurisdictional amount requirement was attached, and such a requirement has remained ever since. The jurisdiction of the state courts, however, was in no way affected by the grant to federal courts of concurrent jurisdiction in federal question cases. In this case, for example, David could have been sued in the state courts of New Jersey. He would undoubtedly have removed to the federal courts pursuant to 28 U.S.C. § 1442(a)(1), since the suit is for acts which were done under color of his federal office. In the removed action the jurisdictional amount requirement would have been inapplicable because § 1442 is a separate jurisdictional grant without regard to amount in controversy. Willingham v. Morgan, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); Venable v. Richards, 105 U.S. 636, 26 L.Ed. 1196 (1882). But if he did not elect to remove, the suit could proceed in the state court. The availability of that remedy would probably suffice to answer any contention that Congress could not constitutionally impose a jurisdictional amount requirement applicable to civil rights cases against federal officers. *See* Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1401 (1953). In any event, that constitutional issue, if it is one, does not seem to concern the Supreme Court, for it recently said:

"Thus, for example, in suits against federal officials for alleged deprivations of constitutional rights, it is necessary to satisfy the amount in controversy requirement for federal jurisdiction. See Oestereich v. Selective Service Board, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402; Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619."

Lynch v. Household Finance Corp., *supra*, 405 U.S. at 547, 92 S.Ct. at 1119. The plaintiffs must, then, meet the amount-in-controversy requirement.

■ The Government contends, relying principally upon Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), that the rights of freedom of speech and assembly are of such a nature as not to be susceptible of valuation in money and are thus beyond the reach of the jurisdiction conferred by § 1331. There is dicta in Justice Stone's opinion suggesting as much. *Id.* at 527–532, 59 S.Ct. 969–972. But his was not the opinion of the Court, and the Supreme Court has never so held. The Sixth Circuit, in Goldsmith v. Sutherland, *supra*, relying on Justice Stone's dictum, has accepted the Government's position. In addition to Hague v. CIO, *supra*, the Sixth Circuit relied, for authority for the proposition that claims of infringement of the right of free speech are incapable of monetary valuation on Giancana v. Johnson, 335 F.2d 366 (7th Cir. 1964), cert. denied, 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965), and Carroll v. Somervell, 116 F.2d 918 (2d Cir. 1941). *Giancana* was a complaint based upon an allegedly unlawful surveillance by agents of the FBI. The complaint did not allege and the plaintiff did not show that the allegedly unlawful activities of the agents subjected him to damages in excess of $10,000.00. To the extent that *Giancana* decides anything beyond the failure to allege and show the jurisdictional amount in controversy, it must be regarded as overruled by Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which holds that a claim for damages for violation of fourth amendment rights is justiciable under § 1331. *Carroll* does not hold that first amendment rights are incapable of valuation. It holds only that the record in that case established the amount in controversy as a specific amount of lost wages, $1,138.-80, which was less than the then applicable $3000.00 jurisdictional amount.

Section 1331 refers both to sum and to value. In cases in which there is an adequate remedy at law, the recovery of damages, the jurisdictional amount must be determined by reference to the sum of those damages. In cases where there is no adequate remedy at law, the measure of jurisdiction is the value of the right sought to be protected by injunctive relief. In some situations the line between the two types of cases tends to blur as in an action for damages for infringement of fourth amendment rights. *See, e. g.,* Bivens v. Six Unknown Named Agents, *supra.* But there are many intangible interests the invasion of which will be quite difficult to value in dollars. One of these is the interest of a Selective Service System registrant in being lawfully classified. That interest obviously must be measured by the intangible value of the proper classification. Though the value of that right may be difficult of precise measure, that difficulty does not make the claim nonjusticiable under § 1331. Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 826 (2d Cir. 1967). The federal courts in injunction actions under § 1331 or § 1332 frequently are asked to protect such intangibles as the good will adhering to a trademark. *E. g.,* Schering Corp. v. Sun Ray Drug Co., 320 F.2d 72 (3d Cir. 1963); Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3d Cir. 1958). If these intangible interests are sufficiently capable of valuation to meet the jurisdictional amount requirement there is no reason to lay down a rule of law that the rights of free speech and free assembly present nonjusticiable problems of valuation. Thus we cannot say as a legal certainty that the plaintiffs at final hearing will be unable to justify the jurisdictional claims which they have pleaded. We decline to follow Goldsmith v. Sutherland, *supra,* insofar as that case suggests the propriety of dismissing for lack of federal jurisdiction.

## PRELIMINARY RELIEF AND JURISDICTIONAL AMOUNT

There is, of course, the point that in the hearing on the plaintiffs' motion for a preliminary injunction no proof was offered specifically directed to establishment of the value of the civil rights for which protection is sought. From this the Government urges that the denial of preliminary injunctive relief should be affirmed without going to the merits of the claims. We do not agree. We have rejected the contention that first amendment rights are incapable of valuation and hence nonjusticiable in a § 1331 case. The complaint alleged the requisite jurisdictional amount. When the motion for a preliminary injunction was before the district court on October 6, 1972, the return day of the order to show cause, that allegation had not been traversed either by answer or by affidavit. The jurisdictional amount contention was not urged upon the district court. The hearing was directed to the alleged incidents of infringement of first amendment rights and to the justification or lack of justification for those infringements. The district court assumed that jurisdiction of the federal court was not in issue, at least with respect to the preliminary injunction. In these circumstances it was understandable that no effort was made to introduce evidence directed specifically to the value of the claimed rights. This was, after all, not a final hearing, but a hearing on a motion for a preliminary injunction. Since as the record of the district court comes before us the allegation of jurisdictional amount remains untraversed, and we cannot say as a legal certainty that the plaintiffs will never be able to establish their jurisdictional amount claim, we must proceed on the same assumption as did the district court.

Indeed, on the evidence in the record it seems at this juncture far more likely than not that the district court will ultimately hold that the value of some of the rights sought to be protected exceeds $10,000.00. Four of the

plaintiffs are candidates for the nation's highest political offices. The rights of speech and assembly for which they seek protection are intimately connected with their quest for that office. Just as in an action for unfair competition we would look at the value of the trademark rather than at the extent of the infringement, Schering Corp. v. Sun Ray Drug Co., *supra*; Ambassador East, Inc. v. Orsatti, Inc., *supra*, so in a political campaign we should look at the value of the campaign rather than at the extent of infringement of the constitutionally protected right to pursue it. The claimed jurisdictional amount of the barred pamphleteers may not be quite so clear. Even as to them, however, without suggesting what our final position may be if the case comes before us after final hearing, we cannot say that the view expressed by Judge Weinstein in Cortright v. Resor, *supra*, is unreasonable. He wrote:

> "Free speech is almost by definition, worth more than $10,000, so that the allegation of jurisdiction based upon 1331 ought not be subject to denial." 325 F.Supp. at 810.

At this preliminary stage, in the state of the record before us, it seems more likely than not that the appellants will, as the district court assumed, satisfy the jurisdictional amount requirement at final hearing. Thus we reject the jurisdictional amount contention as a basis for denial of preliminary injunctive relief.

### THE MERITS OF THE CLAIM

As we have said above, the complaint alleges claims on behalf of two groups with somewhat separate interests, the candidates and the barred pamphleteers. It alleges separate violations which raise two issues. One is applicable to the candidates only. The other is common to both groups. The issue applicable to the candidates only is the legality of barring them from the base because of their status as candidates. The issue common to both groups is the legality of the prohibition against distributing literature which has not been submitted to the prior restraint of an approval by the Adjutant General of Fort Dix pursuant to Fort Dix Regulation No. 210–27.

Under Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), a resolution of these issues requires a description of the Fort Dix Military Reservation. In *Flower* the Court made clear that the power of military authorities to restrict general access to a military facility, recognized in Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), did not apply to those parts of the facility to which the public has been freely admitted. It reversed Flower's conviction for violation of 18 U.S.C. § 1382. The violation charged was the distribution of leaflets within the boundaries of Fort Sam Houston, San Antonio, Texas, after having been barred from the post for similar distributions. The distribution took place on New Braunfels Avenue which passed through the fort, an open post, and over which 17,740 vehicles a day passed without interference from the military.

The district court held that Fort Dix, unlike Fort Sam Houston, was not an open post. That finding is clearly erroneous. The record establishes that Fort Dix, a reservation of over fifty-five square miles, is crossed by ten paved roads including a major state highway, Route 68, on all of which unrestricted vehicular traffic, civilian as well as military, is permitted at all times. In addition, there are many unpaved trails. On the paved roads and on the trails unrestricted pedestrian traffic is permitted. Buses, operated as common carriers, use the roads on the base. They pick up and discharge passengers, civilian and military. Civilians are authorized on the post. There are numerous employed civilians. Business concessions are conducted on the post. Civilians are welcome to visit soldiers. Tourists are welcome. Entertainments are occasionally provided at which as many as 5000 people may congregate at

a sports arena on the post. Outside chaplains conduct religious services on the post. One can visit the post for any reason at all, or no reason at all, except apparently, to campaign for political office or to distribute unapproved leaflets. The gate at which candidates Spock and Pulley were stopped is on the Wrightstown road, about five feet from the commercial district of Wrightstown. It is normally open and unguarded, but was apparently guarded by representatives of defendant David on September 23, 1972, in anticipation of the visit. A traffic count taken in 1970, the most recent available, disclosed a daily vehicle count through the reservation of 66,000 vehicles. There are a few restricted areas in the reservation, such as the ammunition magazine area and the stockade, but these are either fenced off, or if not fenced off, marked by signs as restricted areas or patrolled by sentries. Only authorized personnel are permitted in the restricted areas, but the remainder of the base is open to the general public, except for political candidates, or persons distributing unapproved literature, and except for those persons to whom the commander of the fort has issued a bar order. Fort Dix, when compared to Fort Sam Houston, is *a fortiori* an open post. *See* Jenness v. Forbes, 351 F.Supp. 88 (D.R.I.1972).

 The Federal Government exercises jurisdiction over the entire reservation. Its military policemen enforce traffic regulations and the criminal laws applicable to offenses on federal military reservations. But the fact of the exercise of such jurisdiction does not imply the power to selectively exclude persons solely on the ground of exercise of rights protected by the first amendment. If the reservation is open to all the rest of the public, there is no basis for holding that it may be closed, selectively, to political candidates or to distributors of unapproved literature.

 We do not suggest any lack of vitality to the principle announced in Cafeteria Workers v. McElroy, *supra.* That principle undoubtedly protects from intrusion those areas of Fort Dix which have in fact been closed to the public. *See* Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). And it is clear that even on an open post the military authorities are as free as their civil counterparts to impose reasonable regulations to prevent disruption of the primary mission of the facility. *See* Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). But here the record makes clear that distribution of leaflets to military personnel and to the base housing, occupied by military personnel and their dependents, is permitted if the leaflets are first approved as to content. The record makes clear that almost the world-at-large, with the exception of political candidates, is free to come on the base and talk to persons living and working there. The record makes clear that large assemblies occasionally take place. Thus we cannot find that distribution of leaflets, face to face campaigning, or even the holding of meetings would *per se* be disruptive of the mission of the facility. The military authorities have themselves decided otherwise.

The district court refers to the recent decision in Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), as authority for the denial of the preliminary injunction. That case is not in point. It involved the right of a private owner of a shopping center to issue invitations to his place of business for selected private rather than for public purposes. The case limits Amalgamated Food Employees Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), and Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). That entire line of cases, however, turns upon the extent to which private parties have, by undertaking functions of a nature generally thought of as public, made themselves subject to the strictures of the first amendment which are ordinarily applicable to governmental actions. *Lloyd Corp.* does not enlighten on the issues presented in this case, which involves

governmental action to which the first amendment clearly applies. It is one thing to say that a private landowner may issue invitations to the public for selective purposes and thereby exclude demonstrations from his premises. It is quite another to say that a governmental official charged with the custody and control of publicly owned lands may issue or withhold such invitations using a classification forbidden by the first amendment. The latter is the charge alleged in this case.

Nor do we imply that the military commander of an open post may not be free to issue bar orders prohibiting some persons from the entire post. The record discloses that such orders have been issued for offenses such as possession of marijuana or narcotics, assault, possession of stolen property, solicitation for prostitution, carrying concealed weapons, traffic offenses, contributing to the delinquency of a minor, impersonating a female, fraud, and unauthorized use of an ID card. For all of these activities bar orders may be appropriate. But bar orders have also been issued for distributing "unauthorized publications." Unauthorized publications are those which have not been submitted to and approved by the Adjutant General, and his approval or disapproval depends upon the content of the message. A more vivid instance of a prior restraining on activities protected by the first amendment can hardly be imagined.

The Government contends that Fort Dix Regulations No. 210–26, which prohibits political speeches, and No. 210–27, which requires approval of the content of publications prior to their distribution, are authorized, at least, if not required by Army Regulation No. 360–61. In relevant part that regulation provides:

"2–1 General. The policy of the Department of the Army is to support public events in the civilian domain subject to operational and training requirements, budget limitations, and guidelines enumerated in paragraph 2–3.

2–2. Restrictions. *a.* Army participation (and cooperation) is not authorized when such participation may directly or indirectly (indorse or selectively) benefit (or favor), or appear to (indorse or selectively) benefit (or favor) a private individual, group, corporation (whether for profit or nonprofit), sect, fraternal organization, quasi-religious or ideological movement, political group, or commercial venture, or be associated with solicitation of votes in a political election.

(1) For the purpose of this regulation—

(*a*) Providing use of Government facilities, such as transportation, housing, or messing, at Government expense is considered a form of Army participation."

This Army Regulation seems on its face inapplicable. The appellants did not seek the use of government transportation, housing, or messing. They sought the same right of public access as is afforded to the public-at-large. Moreover, even if permitting political campaigning and leaflet distribution in the open areas of Fort Dix were to be considered to be the provision of government facilities, it stretches credulity to assume that permitting such use would be an endorsement or selective benefit for the candidates who in this case seek relief. All that is required by Army Regulation No. 360–61, it would seem, is even-handed neutrality.

The district court would require much more than even-handed neutrality. Its opinion urges:

"It is clear that the First Amendment rights of the plaintiffs must be carefully weighed against the interests of the military in prohibiting political activity in the confines of the base and other exercises inimical to the military mission at Fort Dix. The reasoning behind the Regulations [Fort Dix Nos. 210–26, 210–27] here involved is apparent. Aside from urging its personnel to vote, clearly a

healthy motive, the military must remain politically antiseptic." 349 F. Supp. at 182.

With the voting age at eighteen years probably the vast majority of the 28,000 people living in Fort Dix are entitled to vote. If they are to exercise that franchise intelligently they should have as free access to campaign information, subject to the time strictures of their military occupations, as citizens generally. A policy of antisepsis such as the district court envisioned would not be neutral. It would consign military voters to the category of the uninformed. But in fact there is no such policy of antisepsis. The record discloses that the military permits the circulation and distribution in Fort Dix of a wide range of newspapers and magazines, and that radios and televisions are available during off-duty hours. Thus the persons living in Fort Dix are exposed to the political ideas of those candidates whose campaigns are prominent enough or well-financed enough to attract widespread media coverage. In these circumstances the antisepsis of Fort Dix Regulations Nos. 210–26 and 210–27 is hardly a neutral antisepsis. What the Fort Dix voters are protected from, practically speaking, is exposure to the political ideas of those minor candidates whose campaigns are neither prominent enough nor sufficiently well-financed to attract media coverage, and who must make do with the more old fashioned face-to-face style of campaigning. Such a feigned neutrality serves no discernable military purpose, and cannot outweigh the first amendment rights of the minor candidates.

## PRELIMINARY RELIEF

The need for immediate equitable relief for the candidates is apparent. On October 6, 1972, the election was less than a month away. Today only thirteen days remain. The district court held that there was § 1331 jurisdiction. As to the candidates, the record establishes their status as such and there is an overwhelming likelihood that at final hearing their candidacy will be valued in excess of $10,000.00. They brought this action promptly after being excluded on September 23, 1972. Their cases present a strong likelihood of success at final hearing. A preliminary injunction should have been granted. The barred pamphleteers are in a somewhat different position. Their interests are neither so directly connected with the November 7, 1972 election, nor so promptly and diligently pursued in the courts, as are the interests of the candidates. They make a lesser showing of immediate irreparable injury and possibly a lesser showing of likelihood of meeting the jurisdictional amount. In their case it was, we think, within the bounds of permissible discretion for the district court to withhold relief until final hearing.

Judge Rosen concurs in the result (1) because the district court judge has determined § 1331 jurisdiction and no objection was made to this conclusion by the appellee in the district court, and (2) because this case is squarely within the parameters of the Supreme Court holding in Flower v. United States, *supra*.

The order of the district court will be reversed and the case remanded for the entry of a preliminary injunction directing the defendants to cease from interfering with the political campaigning by the candidate plaintiffs Spock, Hobson, Jenness and Pulley or with the distribution of campaign literature on their behalf within the unrestricted areas of the Fort Dix Military Reservation between the date hereof and November 7, 1972. The order may provide that the right of the candidates to campaign and the distribution of campaign literature shall be subject to such restrictions as to time, place and numbers of persons involved, as shall have been shown by the defendants to be necessary to prevent interference with the military functions of the base, and the flow of military and civilian traffic, but shall not provide for the prior approval by any authority of the contents of any communication.

The case should be set down for a final hearing promptly to dispose of the claims of the candidate plaintiffs for injunctive relief after November 7, 1972, and of the claims for injunctive relief of the barred pamphleteer plaintiffs. The mandate of this court will issue forthwith.

LAYTON, Senior Judge.

With deference, I must dissent for two reasons.

First, in my view, the orderly administration of justice demands that the question whether the required jurisdictional amount is here present should be remanded to the District Court which made no substantive determination of this issue for the reason that it was unchallenged by the government in the lower court, Wolff v. Selective Service Local Board No. 16, 372 F.2d 817 (2d Cir. 1967).[1] Once a finding is made, the substantive question can then be decided on further appeal.

But even should the District Court, based upon some such rationale as advanced by Judge Weinstein in Cortright v. Resor, 325 F.Supp. 797, 810 (E.D.N.Y.1971),[2] conclude that the requisite jurisdictional amount were present, I would have grave difficulty in agreeing for the reason that such a result is not in reality a finding of fact[3] but, rather, an expression of judicial philosophy having the effect of judicially legislating a plain gap in the statutory jurisdiction of the federal courts. See *Wolff* at 372 F.2d p. 826. Thus viewed, the chance of success on final hearing would be remote rather than extremely likely.

Although one's personal belief may be that the right of free speech is inherent-

ly far more valuable than the question of jurisdictional amount, nevertheless, one cannot use that belief to expand the jurisdiction of the federal courts beyond that expressly authorized by Congress. Lynch v. Household Finance Corp., 405 U.S. 538, 547, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

---

1. At p. 826: "Because Judge McLean was of the opinion that this suit was not presently justiciable, he had no occasion to determine whether or not appellants could demonstrate the presence of the requisite amount in controversy. It is an unfortunate gap in the statutory jurisdiction of the federal courts that our ability to hear a suit of this nature depends on whether appellants can satis-

factorily show injury in the amount of $10,000 but the fact remains and *on remand the District Court must determine this question.*" (Emphasis added.)

2. "Free speech is almost by definition worth more than $10,000.00."

3. Goldsmith v. Sutherland, 426 F.2d 1395 (6th Cir. 1970).