# Use of Military Personnel to Maintain Order Among Cuban Parolees on Military Bases

The prohibition in the Posse Comitatus Act, 18 U.S.C. § 1385, against using military personnel to execute the law, was not intended to restrict the military's ability to maintain order among civilians on its own reservations.

Military personnel may take any steps deemed by the base commander to be reasonably necessary to ensure that Cuban parolees housed on a military base do not breach the peace of the base, and may restrict them to areas of the base specifically designated for their use; however, any claim of a parolee of a legal right to depart the base should be evaluated by non-military law enforcement personnel.

May 29, 1980

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your request for our opinion whether, consistent with the Posse Comitatus Act, 18 U.S.C. § 1385, military personnel may be used to maintain law and order among the Cubans paroled into the United States and housed at various United States military bases, awaiting processing under the Immigration and Nationality Act and the Refugee Act of 1980. The answer to your question turns on general principles which this Department and the courts have considered over the years. Based upon this prior consideration, as set forth below, I conclude that the Posse Comitatus Act does not prohibit military commanders from directing the use of military personnel to maintain order among the Cuban parolees while on military bases.

Arrangements have been made for the Cuban parolees to be temporarily housed on three military bases: Fort Chaffee in Arkansas, Fort Indiantown Gap in Pennsylvania, and Eglin Air Force Base in Florida.[1] While the physical arrangements which have been made at each base differ in detail, certain features are common to all three. In each case, an area within the military reservation has been set aside for the parolees, and certain base facilities and supplies have been made available for their use while there. The area set aside has been cordoned off,[2] and the parolees are not authorized to enter other areas of the base

---

[1] The use of military facilities has been arranged by the Federal Emergency Management Agency (FEMA), under authority of § 302(a) of the Disaster Relief Act Amendments of 1974, Pub. L. No. 93–288, 93d Cong., 2d Sess., 88 Stat. 143.

[2] At Eglin AFB a fence has been erected to surround the area in which the Cubans are being housed; at Fort Chaffee and at Indiantown Gap, the boundaries of the reserved area are marked only by sawhorses and ropes.

except as the commanding officer may direct. At Fort Chaffee and at Indiantown Gap, the parolees are being housed in military barracks; at Eglin, temporary shelters of wood and canvas have been specially constructed.

At all three bases, military personnel have been sharing responsibility for the welfare of the parolees with state and federal civilian law enforcement and disaster relief personnel. Questions have been raised, however, as to the nature and extent of participation which may properly be expected of the military in this connection.

Historically, the commander of the military installation has had both the responsibility and the authority to maintain law and order in his command. This authority derives generally from the President's constitutional power as Commander-in-Chief,[3] as well as from statutes,[4] and more particularly from regulations applicable to the respective military services.[5] Congress has implicitly recognized the existence of this authority in two criminal statutes. See 18 U.S.C. § 1382, which makes it unlawful to enter a military base for an unlawful purpose, or to reenter a base after having been removed therefrom; and 50 U.S.C. § 797, which makes unlawful the violation of any "regulation or order" issued by "any military commander designated by the Secretary of Defense" for "the protection or security of" property and places subject to his jurisdiction, including "the ingress thereto or egress or removal of persons therefrom. . . ."

The military's power to preserve order among civilians on its own reservations has been recognized and affirmed by the Supreme Court, see, e.g., Cafeteria Workers Union v. McElroy, 367 U.S. 886 (1961), and by your predecessors. The first explicit formulation of the power of military officers to maintain order among civilians on a military reservation is apparently that given by Attorney General Butler in 1837, 3 Op. Att'y Gen. 268. In the course of affirming the power of the commandant of West Point to exclude civilians from that enclave, the Attorney General said that the commandant "has a general authority to prevent any person within [the base] limits from interrupting its disci-

---

[3] We believe it beyond question that, inherent in the President's power as Commander-in-Chief, is the authority to see that order and discipline are maintained in the armed forces. In the chain of command, base commanders perform this function on behalf of the President, on their respective bases.

[4] Congress has provided that the Secretaries of the Army and Air Force "[are] responsible for and [have] the authority necessary to conduct all affairs" of their respective Departments, 10 U.S.C. §§ 3012(b) and 8012(b). As part of this authority, the Secretaries have been given the power to issue regulations for "the custody, use, and preservation of [the Department's property]." 5 U.S.C. § 301. See also 10 U.S.C. §§ 4832 and 9832. The Supreme Court has held that Army regulations, when sanctioned by the President, have the force of law. See United States v. Eliason, 41 U.S. (16 Pet.) 291, 301–02 (1842).

[5] Regulations promulgated by the Secretary of the Army state that a base commander is "responsible for the efficient and economical operation, administration, service, and supply of all individuals, units, and activities assigned to or under the jurisdiction of the installation . . ." 32 C.F.R. § 552.18(c). In the Air Force, base commanders are "responsible for protecting personnel and property under their jurisdictions and for maintaining order on installations, to insure the uninterrupted and successful accomplishment of the Air Force Mission." 32 C.F.R. § 809a.1(a).

pline, or obstructing in any way the performance of the duties assigned" to military personnel there stationed. *Id.* at 272. Even with respect to civilians owning property within a military enclave, "there can be no doubt of [the commandant's] authority to exclude such person . . . from access to any part of the post not essential to the use of the building he may occupy, and to his ingress and egress from it."

Attorney General Butler's views of the broad discretionary power of the base commander were reiterated by Attorney General Hoyt in 1906: "The power of a military commandant over a reservation is necessarily extensive and practically exclusive, forbidding entrance and controlling residence as the public interest may demand." 26 Op. Att'y Gen. 91, 92.

Numerous statements of the Army Judge Advocate General's Office reconfirm the long-standing power of commanding officers to control civilian access to and behavior on military bases:

> It is well settled that a post commander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline.

JAG 680.44, October 6, 1925. *See also* JAGA 1956/8970, December 27, 1956.

The commander of a military base has broad responsibility for the maintenance of order on the base under his command, and a commensurate degree of authority follows that responsibility. In the recent case of *Relford* v. *Commandant,* 401 U.S. 355, 367 (1971), the Supreme Court stressed "[t]he essential and obvious interest of the military in the security of persons and of property on the military enclave." A military base need not be segregated, and, indeed, generally cannot rationally be segregated into military and non-military areas for law enforcement purposes. Thus, a base commander may exercise his authority to maintain order base-wide, even in areas utilized for putatively non-military purposes. In *Relford,* the Court emphasized:

> [t]he impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission.

401 U.S. at 367. *See also Greer* v. *Spock,* 424 U.S. 828, 838 (1976) in which the Court again noted "the historically unquestioned power" of a commanding officer to prevent civilian disruption of the functioning of a military base.

It is necessary to reconcile this broad and accepted authority of military base commanders with the Posse Comitatus Act, 18 U.S.C. § 1385. That statute, enacted during Reconstruction, provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

The Posse Comitatus Act was passed as a partisan reaction to the equally partisan use of troops for law enforcement purposes in the civilian community after the Civil War.[6] The Act was not intended, and has never been interpreted, to restrict military authorities' ability to maintain the security of a military installation.

In interpreting the applicability of the prohibition of the Posse Comitatus Act to the use of military personnel, the Department of Justice and the Department of Defense generally have been careful to distinguish between the use of such personnel on military bases, on the one hand, and off military bases on the other.[7] And at least one court has specifically held that the Posse Comitatus Act was not intended to prohibit military personnel from arresting civilians on military bases who, by committing crimes, are a threat to military or other federal property or to the good order and discipline of the base. In *United States v. Banks,* 539 F.2d 14 (9th Cir. 1976), *cert. denied,* 429 U.S. 1024 (1977), the United States Court of Appeals for the Ninth Circuit squarely rejected a civilian's claim that his arrest by military police on a military base for violation of federal narcotics law violated the Posse Comitatus Act. The court held that the Act "does not prohibit military personnel from acting upon on-base violations committed by civilians." 539 F.2d at 16.

---

[6] The practice of using troops in a marshal's posse appears to have begun about 1854 during the bitter political struggle over the Fugitive Slave Act in the North, and was explicitly approved by Attorney General Cushing. *See* 6 Op. Att'y Gen. 466, 473 (1854). Following the Civil War, wide use was made of the military posse for law enforcement activities under the control of federal marshals, federal officers, and sheriffs. *See* 7 Cong. Rec. 3581 (1878) (remarks of Rep. Kimmel). During the congressional debates over the Act, a number of specific practices were cited as abuses: the use of troops by federal officials as guards during the 1876 presidential election, *id.* at 3850, 4185, and 4240 (1878) (remarks of Sens. Southard, Merrimon, and Kernan); the widespread use of troops to assist revenue officers in destroying illegal stills, *id.* at 4248 (remarks of Sen. Hill); and the use of troops, without presidential authorization, to assist in the suppression of a labor dispute, *id.* at 3581 (remarks of Rep. Kimmel). The deleterious effect of the practice on the command structure of the Army, and criticism of the general practice by military leaders, were also cited, *id.* at 3581 and 4241 (remarks of Rep. Kimmel and Sen. Sargent).

[7] For example, since 1942 an agreement has existed between the Departments of Defense and Justice permitting military lawyers to prosecute petty offenses committed on military reservations by civilian employees or visitors to the base. *See* paragraphs 6 and 7 of the Department of the ·Army Regulation 27–40. In 1962, after this arrangement had been in effect for over 20 years, both the Office of Legal Counsel of this Department and the Judge Advocate General of the Army reaffirmed that this practice does not violate the Posse Comitatus Act.

Applying this learning and experience to present circumstances, I conclude that the Posse Comitatus Act does not restrict the broad authority of military commanders in their use of military personnel to protect the "morale, discipline, reputation and integrity" of the base while the Cuban parolees are housed there. To this end, military personnel may take any steps deemed by the base commander to be reasonably necessary to ensure that the Cuban parolees do not breach the peace of the base, even where disturbances are confined to the area to which the parolees are restricted. Military personnel may apprehend and restrain parolees for on-base violations of federal and state law which in the base commander's view threaten the security and good order of the base.[8]

The military has primary authority for the care of the Cuban parolees while they are housed on the bases, and it can use military personnel to protect the delivery of that care against any disruption. Military personnel may use necessary force against civilian conduct threatening military equipment or facilities provided for the use of the parolees, and may patrol within the reserved area for this purpose.

Finally, a military commander may lawfully restrict the parolees' access to areas of the base not specifically designated for their use, and may use military personnel to enforce this restriction. Specifically, military personnel may be used to contain the parolees within the area to which they have been assigned. However, a claim by a parolee of a legal right to depart a base should be evaluated by non-military law enforcement personnel.

It should not go unremarked that all or most of these measures seem to be well within the authority given the base commander in the regulations of both the Army and the Air Force.[9]

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[8] If a Cuban parolee is arrested, he should be turned over as soon as practicable to civilian authorities. *See* 32 C.F.R. § 501.1(c).

[9] *See, e.g.,* 32 C.F.R. § 552.18(f) (Army commandant may establish rules governing entry into and exit from the installation, and the search of civilians when entering, during their stay, or when leaving); 32 C.F.R. § 851.13 (Air Force regulations on resource protection and visitor "control and surveillance" in controlled areas of the base). *See also* 32 C.F.R. § 503.1 (Army personnel have "the ordinary right and duty of citizens to assist in the maintenance of the peace," and may apprehend and restrain persons committing a felony or breach of the peace in their presence).