GREER, COMMANDER, FORT DIX MILITARY
RESERVATION, ET AL. *v.* SPOCK ET AL.

No. 74–848.   Argued November 5, 1975—Decided March 24, 1976

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 840. POWELL, J., filed a concurring opinion, in Part III of which BURGER, C. J., joined, *post*, p. 842. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 849. MARSHALL, J., filed a dissenting opinion, *post*, p. 872. STEVENS, J., took no part in the consideration or decision of the case.

*Solicitor General Bork* argued the cause for petitioners. With him on the brief were *Assistant Attorney General Lee, Deputy Solicitor General Randolph, Robert E. Kopp,* and *Anthony J. Steinmeyer.*

*David Kairys* argued the cause and filed a brief for respondents.*

*\*Norman Dorsen, Melvin L. Wulf,* and *Joel M. Gora* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

MR. JUSTICE STEWART delivered the opinion of the Court.

The Fort Dix Military Reservation is a United States Army post located in a predominantly rural area of central New Jersey. Its primary mission is to provide basic combat training for newly inducted Army personnel. Accordingly, most of its 55 square miles are devoted to military training activities. The Federal Government exercises exclusive jurisdiction over the entire area within Fort Dix, including the state and county roads that pass through it.[1] Civilian vehicular traffic is permitted on paved roads within the reservation, and civilian pedestrian traffic is permitted on both roads and footpaths. Military police regularly patrol the roads within the reservation, and they occasionally stop civilians and ask them the reason for their presence. Signs posted on the roads leading into the reservation state: "All vehicles are subject to search while on the Fort Dix Military Reservation" and "Soliciting prohibited unless approved by the commanding general." The main entrances to Fort Dix are not normally guarded, and a sign at one of the entrances says "Visitors Welcome." Civilians are freely permitted to visit unrestricted areas of the reservation.

---

[1] See N. J. Stat. Ann. 52:30-2 (1955):

"Exclusive jurisdiction in and over any land . . . acquired by the United States is hereby ceded to the United States for all purposes except the service of process issued out of any of the courts of this state in any civil or criminal proceeding."

See also N. J. Stat. Ann. 27:5A-1 (1966):

"Whenever any public road or highway is located wholly or in part within the limits of a United States military reservation, the United States military authorities shall have the power, within the limits of such reservations, to police such roads and highways, to regulate traffic thereon, and to exercise such supervisory powers over such roads and highways as they may deem necessary to protect life and property on such military reservations."

Civilian speakers have occasionally been invited to the base to address military personnel. The subjects of their talks have ranged from business management to drug abuse. Visiting clergymen have, by invitation, participated in religious services at the base chapel. Theatrical exhibitions and musical productions have also been presented on the base. Speeches and demonstrations of a partisan political nature, however, are banned by Fort Dix Reg. 210–26 (1968), which provides that "[d]emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities are prohibited and will not be conducted on the Fort Dix Military Reservation." The regulation has been rigidly enforced: Prior to this litigation, no political campaign speech had ever been given at Fort Dix. Restrictions are also placed on another type of expressive activity. Fort Dix Reg. 210–27 (1970) provides that "[t]he distribution or posting of any publication, including newspapers, magazines, handbills, flyers, circulars, pamphlets or other writings, issued, published or otherwise prepared by any person, persons, agency or agencies . . . is prohibited on the Fort Dix Military Reservation without prior written approval of the Adjutant General, this headquarters." [2]

---

[2] This regulation does not permit the Fort Dix authorities to prohibit the distribution of conventional political campaign literature. The post regulation was issued in conformity with Army Reg. 210–10, ¶ 5–5 (c) (1970), which states that permission to distribute a publication may be withheld only where "it appears that the dissemination of [the] publication presents a clear danger to the loyalty, discipline, or morale of troops at [the] installation. . . ." The Army regulation further provides that if a base commander decides to withhold permission to distribute a publication, he shall "inform the next major commander and Headquarters, Department of the Army . . . and request . . . approval to prohibit the distribution of that publication or the particular issue thereof." ¶ 5–5 (d). The base commander may delay distribution of the publication in

In 1972, the respondents Benjamin Spock and Julius Hobson were the candidates of the People's Party for the offices of President and Vice President of the United States, and Linda Jenness and Andrew Pulley were the candidates of the Socialist Workers Party for the same offices. On September 9, 1972, Spock, Hobson, Jenness, and Pulley wrote a joint letter to Major General Bert A. David, then commanding officer of Fort Dix, informing him of their intention to enter the reservation on September 23, 1972, for the purpose of distributing campaign literature and holding a meeting to discuss election issues with service personnel and their dependents. On September 18, 1972, General David rejected the candidates'

---

question pending approval or disapproval of his request by Army headquarters. *Ibid.*

A Department of the Army letter, dated June 23, 1969, entitled Guidance on Dissent, ¶ 5 (a) (3), gives as examples of materials which a commander need not allow to be distributed "publications which are obscene or otherwise unlawful (e. g., counselling disloyalty, mutiny, or refusal of duty)."

Commercial magazines and newspapers distributed through regular outlets such as post exchange newsstands need not be approved before distribution. Army Reg. 210–10, ¶¶ 5–5 (c), (d), does provide that a commander may delay, and the Department of the Army may prohibit, the distribution of particular issues of such publications through official outlets. See Department of the Army letter, *supra,* ¶ 5 (a)(1). The substantive standards for such restrictions are the same as those applicable to publications distributed other than through official outlets. *Id.,* ¶¶ 5 (a)(1), (2); Army Reg. 210–10, ¶ 5–5 (e). This provision of Army Reg. 210–10, ¶ 5–5, allowing commanders to halt the distribution of particular issues of publications through regular outlets appears to be inconsistent with Department of Defense Directive 1325.6, ¶ III (A)(1) (1969), which provides that "[a] Commander is not authorized to prohibit the distribution of a specific issue of a publication through official outlets such as post exchanges and military libraries." See Note, Prior Restraints in the Military, 73 Col. L. Rev. 1089, 1106 n. 127 (1973).

request, relying on Fort Dix Regs. 210–26 and 210–27.[3] Four of the other respondents, Ginaven, Misch, Hardy, and Stanton, were evicted from Fort Dix on various occasions between 1968 and 1972 for distributing literature not previously approved pursuant to Fort Dix Reg. 210–27. Each was barred from re-entering Fort Dix and advised that re-entry could result in criminal prosecution.[4]

On September 29, 1972, the respondents filed this suit in the United States District Court for the District of

---

[3] General David's letter stated, in pertinent part:

"Your request to visit Fort Dix and campaign among our servicemen and women is denied.

"There are several compelling reasons for this denial which I shall enumerate. First, there are lawful regulations in effect which prohibit political speeches and similar activities on all of the Fort Dix Military Reservation (Fort Dix Regulation 210–26). The distribution of literature without prior approval of this headquarters is also prohibited (Fort Dix Regulation 210–27). Also, Department of the Army Regulations prohibit military personnel from participating in any partisan political campaign and further prohibits [sic] them from appearing at public demonstrations in uniform.

"The mission assigned to me as Commanding General of Fort Dix is to administer basic combat training to approximately 15,000 men at any given time. These men spend a period of eight weeks here during which they perform their training on very vigorous schedules occupying virtually all of their time. I am not in a position to dilute the quality of this training by expanding these schedules to include time to attend political campaigning and speeches. Political campaigning on Fort Dix cannot help but interfere with our training and other military missions.

"To decide otherwise could also give the appearance that you or your campaign is supported by me in my official capacity. I feel that I am prohibited from doing this for any candidate for public office."

[4] Title 18 U. S. C. § 1382, provides that "[w]hoever reenters or is found within [a military] reservation . . . after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—Shall be fined not more than $500 or imprisoned not more than six months, or both."

New Jersey to enjoin the enforcement of the Fort Dix regulations governing political campaigning and the distribution of literature, upon the ground that the regulations violated the First and Fifth Amendments of the Constitution. The District Court denied a preliminary injunction, *Spock* v. *David*, 349 F. Supp. 179, but the Court of Appeals reversed that order and directed that preliminary injunctive relief be granted to the respondents Spock, Hobson, Jenness, and Pulley. *Spock* v. *David*, 469 F. 2d 1047.[5] Pursuant to this judgment the respondent Spock conducted a campaign rally at a Fort Dix parking lot on November 4, 1972. The District Court subsequently issued a permanent injunction prohibiting the military authorities from interfering with the making of political speeches or the distribution of leaflets in areas of Fort Dix open to the general public,[6] and the Court of Appeals affirmed this final judgment. *Spock* v. *David*, 502 F. 2d 953. We granted certiorari to consider the important federal questions presented. 421 U. S. 908.

In reaching the conclusion that the respondents could not be prevented from entering Fort Dix for the purpose of making political speeches or distributing leaflets, the Court of Appeals relied primarily on this Court's *per curiam* opinion in *Flower* v. *United States*, 407 U. S. 197.

---

[5] The Court of Appeals did not disturb the denial of preliminary relief to the four noncandidate respondents because their interests were not viewed as "so directly connected with [the upcoming Presidential] election, [or] so promptly and diligently pursued in the courts, as are the interests of the candidates. They make a lesser showing of immediate irreparable injury and possibly a lesser showing of likelihood of meeting the jurisdictional amount." 469 F. 2d, at 1056.

[6] The District Court dismissed the complaint as to Jenness and Pulley because they were below the constitutional age limits for the offices they sought. There was no appeal from that part of the District Court's judgment.

In the *Flower* case the Court summarily reversed the conviction of a civilian for entering a military reservation after his having been ordered not to do so. At the time of his arrest the petitioner in that case had been "quietly distributing leaflets on New Braunfels Avenue at a point within the limits of Fort Sam Houston, San Antonio, Texas." *Ibid.* The Court's decision reversing the conviction, made without the benefit of briefing or oral argument, rested upon the premise that " 'New Braunfels Avenue was a completely open street,' " and that the military had "abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue." *Id.,* at 198. Under those circumstances, the "base commandant" could "no more order petitioner off this public street because he was distributing leaflets than could the city police order any leaflete[e]r off any public street." *Ibid.*

The decision in *Flower* was thus based upon the Court's understanding that New Braunfels Avenue was a public thoroughfare in San Antonio no different from all the other public thoroughfares in that city, and that the military had not only abandoned any right to exclude civilian vehicular and pedestrian traffic from the avenue, but also any right to exclude leafleteers—"any claim [of] special interests in who walks, talks, or distributes leaflets on the avenue."

That being so, the Court perceived the *Flower* case as one simply falling under the long-established constitutional rule that there cannot be a blanket exclusion of First Amendment activity from a municipality's open streets, sidewalks, and parks for the reasons stated in the familiar words of Mr. Justice Roberts in *Hague* v. *CIO,* 307 U. S. 496, 515–516:

> "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been

used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

See, e. g., Niemotko v. Maryland, 340 U. S. 268; Saia v. New York, 334 U. S. 558, 561 n. 2; Murdock v. Pennsylvania, 319 U. S. 105; Jamison v. Texas, 318 U. S. 413, 416; Cantwell v. Connecticut, 310 U. S. 296; Schneider v. State, 308 U. S. 147.

The Court of Appeals was mistaken, therefore, in thinking that the Flower case is to be understood as announcing a new principle of constitutional law, and mistaken specifically in thinking that Flower stands for the principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a "public forum" for purposes of the First Amendment. Such a principle of constitutional law has never existed, and does not exist now. The guarantees of the First Amendment have never meant "that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." Adderley v. Florida, 385 U. S. 39, 48. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Id., at 47. See also Cox v.

*Louisiana,* 379 U. S. 559, 560–564.   Cf. *Pell* v. *Procunier,* 417 U. S. 817.

The Court of Appeals in the present case did not find, and the respondents do not contend, that the Fort Dix authorities had abandoned any claim of special interest in regulating the distribution of unauthorized leaflets or the delivery of campaign speeches for political candidates within the confines of the military reservation. The record is, in fact, indisputably to the contrary.[7]   The *Flower* decision thus does not support the judgment of the Court of Appeals in this case.

Indeed, the *Flower* decision looks in precisely the opposite direction.   For if the *Flower* case was decided the way it was because the military authorities had "abandoned any claim [of] special interests in who walks, talks, or distributes leaflets on the avenue," then the implication surely is that a different result must obtain on a military reservation where the authorities have *not* abandoned such a claim.   And if that is not the conclusion clearly to be drawn from *Flower,* it most assuredly is the conclusion to be drawn from almost 200 years of American constitutional history.

One of the very purposes for which the Constitution was ordained and established was to "provide for the common defence,"[8] and this Court over the years has on countless occasions recognized the special constitutional function of the military in our national life, a function both explicit and indispensable.[9]   In short, it

---

[7] See n. 3, *supra.*

[8] U. S. Const. Preamble.   See also U. S. Const., Art. I, § 8; Art. II, § 2.

[9] For illustrative recent decisions of this Court see, *e. g., Schlesinger* v. *Councilman,* 420 U. S. 738; *Schlesinger* v. *Ballard,* 419 U. S. 498; *Parker* v. *Levy,* 417 U. S. 733; *Bell* v. *United States,* 366 U. S. 393; *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11; *Burns* v. *Wilson,* 346 U. S. 137; *Orloff* v. *Willoughby,* 345 U. S. 83; *Gusik* v. *Schilder,* 340 U. S. 128.

is "the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 17. And it is consequently the business of a military installation like Fort Dix to train soldiers, not to provide a public forum.

A necessary concomitant of the basic function of a military installation has been "the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 893. The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is thus historically and constitutionally false.

The respondents, therefore, had no generalized constitutional right to make political speeches or distribute leaflets at Fort Dix, and it follows that Fort Dix Regs. 210–26 and 210–27 are not constitutionally invalid on their face. These regulations, moreover, were not unconstitutionally applied in the circumstances disclosed by the record in the present case.[10]

With respect to Reg. 210–26, there is no claim that the military authorities discriminated in any way among candidates for public office based upon the candi-

---

[10] The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there. The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.

dates' supposed political views.[11] It is undisputed that, until the appearance of the respondent Spock at Fort Dix on November 4, 1972, as a result of a court order, no candidate of any political stripe had ever been permitted to campaign there.

What the record shows, therefore, is a considered Fort Dix policy, objectively and evenhandedly applied, of keeping official military activities there wholly free of entanglement with partisan political campaigns of any kind. Under such a policy members of the Armed Forces stationed at Fort Dix are wholly free as individuals to attend political rallies, out of uniform and off base. But the military as such is insulated from both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates.

Such a policy is wholly consistent with the American constitutional tradition of a politically neutral military establishment under civilian control. It is a policy that has been reflected in numerous laws and military regulations throughout our history.[12] And it is a policy that the military authorities at Fort Dix were constitutionally free to pursue.

---

[11] Cf. *Jenness* v. *Forbes,* 351 F. Supp. 88 (RI).

[12] Members of the Armed Forces may not be polled by any person or political party to determine their choice among candidates for elective office, 18 U. S. C. § 596; it is unlawful to solicit political contributions in any fort or arsenal, 18 U. S. C. § 603; candidates for federal office are prohibited from soliciting contributions from military personnel, 18 U. S. C. § 602; no commissioned or noncommissioned officer in the Armed Forces may attempt to influence any member of the Armed Forces to vote for any particular candidate, 50 U. S. C. § 1475; no officer of the Armed Forces may "in any manner interfere with the freedom of any election in any State," 42 U. S. C. § 1972; a military officer may not have troops under his control at any place where a general or special election is held, 18 U. S. C. § 592. See also Army Reg. 600–20 (1971); Army Reg. 670–5 (1975).

With respect to Reg. 210–27, it is to be emphasized that it does not authorize the Fort Dix authorities to prohibit the distribution of conventional political campaign literature. The only publications that a military commander may disapprove are those that he finds constitute "a clear danger to [military] loyalty, discipline, or morale," and he "may not prevent distribution of a publication simply because he does not like its contents," or because it "is critical—even unfairly critical—of government policies or officials . . . ."[13] There is nothing in the Constitution that disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command.

It is possible, of course, that Reg. 210–27 might in the future be applied irrationally, invidiously, or arbitrarily. But none of the respondents in the present case even submitted any material for review. The noncandidate respondents were excluded from Fort Dix because they had previously distributed literature there without even attempting to obtain approval for the distribution. This case, therefore, simply does not raise any question of unconstitutional application of the regulation to any specific situation. Cf. *Rescue Army* v. *Municipal Court*, 331 U. S. 549.

For the reasons set out in this opinion the judgment is reversed.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, concurring.

I concur in the Court's opinion, and also in Part III of MR. JUSTICE POWELL's concurring opinion.

---

[13] Department of the Army letter, *supra*, n. 2, ¶¶ 5 (a) (1), (3).

Permitting political campaigning on military bases cuts against a 200-year tradition of keeping the military separate from political affairs, a tradition that in my view is a constitutional corollary to the express provision for civilian control of the military in Art. II, § 2, of the Constitution.

As MR. JUSTICE POWELL notes, however, Fort Dix Reg. 210-27—at least to the extent that it permits distribution of some political leaflets on military bases—cannot be justified as implementing this policy of separation or even as consistent with our tradition of separation. I agree that the regulation, insofar as it permits a military commander to avert a clear threat to the loyalty, discipline, or morale of his command, is justified by the requirements of military life and the mission of the Armed Forces. But a commander could achieve this goal in another way as well, by banning the distribution on base of *all* political leaflets; the hard question for me is whether the Constitution requires a ban on all distributions in order to preserve the separation of the military from politics. Although there are dangers in permitting any distribution of political materials on a military base, those dangers are of less magnitude and narrower in scope than the dangers involved in requiring the military to permit political rallies and campaigning on a base; the risk that soldiers will become identified with a particular candidate is, for example, less when a leaflet is handed out than when meetings or political rallies are held. The differences are substantial enough that the decision whether to permit conventional political material to be distributed is one properly committed to the judgment of the military authorities—whether or not they have exercised that judgment wisely in promulgating the regulation before us.

I would add only a note of caution. History demonstrates, I think, that the real threat to the independence

and neutrality of the military—and the need to maintain as nearly as possible a true "wall" of separation—comes not from the kind of literature that would fall within the prohibition of Reg. 210-27, but from the risk that a military commander might attempt to "deliver" his men's votes for a major-party candidate. This record, as the Court notes, presents no issue of discriminatory or improper. enforcement, but that should not be taken as an indication that the issue is not one of serious dimensions. It is only a little more than a century .ago that some officers of the Armed Forces, then in combat, sought to exercise undue influence either for President Lincoln or for his opponent, General McClellan, in the election of 1864.

MR. JUSTICE POWELL, concurring.

I join the Court's opinion, and express these additional thoughts.

## I

This case presents the question whether campaign activities and face-to-face distribution of literature for other causes on a military base can be regulated and even prohibited because of the unique character of the Government property upon which the expression is to take place. Candidate respondents propose to use streets and other areas of Fort Dix that are open to the public for partisan political rallies and handbilling. Noncandidate respondents seek to distribute literature in these areas without prior approval by Fort Dix officials.

Although no prior decision of the Court is directly in point, the appropriate framework of analysis is settled. As MR. JUSTICE BRENNAN's dissenting opinion today recognizes, First Amendment rights are not absolute under all circumstances. They may be circumscribed when necessary to further a sufficiently strong public

interest. See *Pell* v. *Procunier,* 417 U. S. 817 (1974); *Adderley* v. *Florida,* 385 U. S. 39 (1966); *Cox* v. *Louisiana,* 379 U. S. 559 (1965). But our decisions properly emphasize that any significant restriction of First Amendment freedoms carries a heavy burden of justification. See, *e. g., Buckley* v. *Valeo, ante,* at 64–65; *Grayned* v. *City of Rockford,* 408 U. S. 104, 116–117 (1972).

An approach analogous to that which must be employed in this case was described in *Grayned* v. *City of Rockford, supra.* The Court is to inquire "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." 408 U. S., at 116. See also *Pell* v. *Procunier, supra,* at 822; *Tinker* v. *Des Moines School District,* 393 U. S. 503, 509 (1969). As *Tinker* demonstrates, it is not sufficient that the area in which the right of expression is sought to be exercised be dedicated to some purpose other than use as a "public forum," or even that the primary business to be carried on in the area may be disturbed by the unpopular viewpoint expressed. *Id.,* at 508–509. Our inquiry must be more carefully addressed to the intrusion on the specific activity involved and to the degree of infringement on the First Amendment rights of the private parties. Some basic incompatibility must be discerned between the communication and the primary activity of an area.

In this case we deal with civilian expression in the domain of the military. Fort Dix is not only an area of property owned by the Government and dedicated to a public purpose. It is also the enclave of a system that stands apart from and outside of many of the rules that govern ordinary civilian life in our country:

> "A military organization is not constructed along democratic lines and military activities cannot be governed by democratic procedures. Military insti-

> tutions are necessarily far more authoritarian; military decisions cannot be made by vote of the interested participants. . . . [T]he existence of the two systems [military and civilian does not] mean that constitutional safeguards, including the First Amendment, have no application at all within the military sphere. It only means that the rules must be somewhat different." T. Emerson, The System of Freedom of Expression 57 (1970).

In this context our inquiry is not limited to claims that the exercise of First Amendment rights is disruptive of base activity. We also must consider their functional and symbolic incompatibility with the "specialized society separate from civilian society," *Parker* v. *Levy*, 417 U. S. 733, 743 (1974), that has its home on the base.[1]

## II

I turn first to Fort Dix's ban on political activities, such as rallies, within the environs of the base.[2] With the

---

[1] I agree with the Court that the holding today is not inconsistent with our decision in *Flower* v. *United States*, 407 U. S. 197 (1972). We stressed there that the area in which the petitioner had distributed leaflets was an " 'important traffic artery' " in the city of San Antonio, equivalent in every relevant respect to a city street. Under the circumstances, the exercise of First Amendment activities along the thoroughfare was not incompatible with the neutrality or the disciplinary goals of the base proper. Fort Dix, in constrast, is a discrete military training enclave in a predominately rural area.

[2] Fort Dix Reg. 210–26 (1968) prohibits "[d]emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities." It is not clear whether "similar activities" include the distribution of leaflets with a partisan political content. I find it difficult to draw a principled distinction, in terms of the neutrality interests outlined below, between a small rally, a "street walking" campaign by a candidate, and the handing out of campaign literature by a candidate or his supporter. Therefore, I will assume for purposes of this discussion that Reg. 210–26 applies to all partisan activity.

majority, I have concluded that the legitimate interests of the public in maintaining the reality and appearance of the political neutrality of the Armed Services in this case outweigh the interests of political candidates and their servicemen audience in the availability of a military base for campaign activities. It may be useful to elaborate on the Court's identification of these interests.

This case bears some similarity to that before the Court in *CSC* v. *Letter Carriers,* 413 U. S. 548 (1973). In that case the Court held that limitations on partisan political activities by federal employees were justified because it was necessary to insure that "the Government and its employees" in fact execute the laws impartially and that they appear to the public to be doing so, "if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Id.,* at 565. We emphasized that the limitations were narrowly drawn, leaving federal employees free to vote as they choose and to "express [their opinions] on political subjects and candidates." *Id.,* at 575–576.

In this case we are mindful of an equally strong tradition, now nearly two centuries old, of maintaining noninvolvement by the military in politics. As the Court has pointed out, this tradition is buttressed by numerous federal laws and military regulations. *Ante,* at 839 n. 12. The overriding reason for preserving this neutrality is noted in MR. JUSTICE BRENNAN's dissenting opinion:

> "It is the lesson of ancient and modern history that the major socially destabilizing influence in many European and South American countries has been a highly politicized military." *Post,* at 867.

This lesson may have prompted the constitutional requirement that the President be the Commander in Chief of the Armed Forces. U. S. Const., Art. II, § 2. Command of the Armed Forces placed in the political

head of state, elected by the people, assures civilian control of the military. Few concepts in our history have remained as free from challenge as this one. But complete and effective civilian control could be compromised by participation of the military *qua* military in the political process. There is also a legitimate public concern with the preservation of the appearance of political neutrality and nonpartisanship. There must be public confidence that civilian control remains unimpaired, and that undue military influence on the political process is not even a remote risk.

The exclusion of political rallies and face-to-face campaigning from a military base furthers both the appearance and the reality of political neutrality on the part of the military. Such an exclusion, for example, makes it less likely that candidates will fashion partisan appeals addressed to members of the Armed Services rather than to the public at large, whereas compelling bases to be open to campaigning would invite such appeals. Traditionally, candidates for office have observed scrupulously the principle of a politically neutral military and have not sought to identify or canvass a "military vote." If one candidate commences to tour military bases—or sends supporters for that purpose—others may feel compelled to follow. The temptation to focus on issues that specifically appeal to military personnel would be difficult to resist.

Even if no direct appeals to the military audience were made, the mere fact that one party or candidate consistently draws large crowds on military bases while another attracts only spotty attendance could—and probably would—be interpreted by the news media and the civilian public as indicating that the military supports one as opposed to the other. Questions also could arise as to whether pressures, direct or indirect, to support one

candidate or rally more generously than another were being exerted by commanders over enlisted personnel. And partisan political organizing and soliciting by soldiers within the base may follow.

The public interest in preserving the separation of the military from partisan politics places campaign activities on bases in a unique position. Unlike the normal civilian pedestrian and vehicular traffic that is permitted freely in Fort Dix, person-to-person campaigning may seriously impinge upon the separate and neutral status of the Armed Services in our society.

At the same time, the infringement on the individual First Amendment rights of the candidates and the servicemen is limited narrowly to the protection of the particular Government interest involved. Political communications reach military personnel on bases in every form except when delivered in person by the candidate or his supporters and agents. The prohibition does not apply to television, radio, newspapers, magazines, and direct mail. Nor could there be any prohibition on handing out leaflets and holding campaign rallies outside the limits of the base. Soldiers may attend off-base rallies as long as they do so out of uniform. The candidates, therefore, have alternative means of communicating with those who live and work on the Fort; and servicemen are not isolated from the information they need to exercise their responsibilities as citizens and voters. Our national policy has been to preserve a distinction between the role of the soldier and that of the citizen. See regulations cited *ante,* at 839 n. 12. A reasonable place to draw the line is between political activities on military bases and elsewhere. The military enclave is kept free of partisan influences, but individual servicemen are not isolated from participation as citizens in our democratic process.

In sum, the public interest in insuring the political neutrality of the military justifies the limited infringement on First Amendment rights imposed by Fort Dix authorities.[3]

### III

The noncandidate respondents contest the Fort Dix regulation requiring prior approval of all handbill, pamphlet, and leaflet literature (even if nonpartisan) before distribution on the base. The public interest in military neutrality is not at issue here, but the restriction is more limited and is directed to another concern. Under Army Reg. 210–10, ¶ 5–5 (c) (1970), permission is to be denied only where dissemination of the literature poses a danger "to the loyalty, discipline, or morale of troops." This regulation is responsive to the unique need of the military to "insist upon a respect for duty and a discipline without counterpart in civilian life." *Schlesinger* v. *Councilman*, 420 U. S. 738, 757 (1975). We have said, in *Parker* v. *Levy*, 417 U. S., at 758, that "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it."

Concern for morale and discipline is particularly strong where, as here, the primary function of the base is to provide basic combat training for new recruits. The basic training period is an especially difficult one for the

---

[3] Of course, if the base authorities were to permit any candidate or his supporters to engage in personal politicking on the base, the interest in military neutrality would then require that all candidates and their supporters be allowed. The base authorities cannot select among candidates and permit the supporters of some to canvass the base without engaging in improper partiality. There is no indication in the record, however, that the Fort Dix authorities ever have permitted partisan appeals to take place on the base.

newly inducted serviceman, for he must learn "the subordination of the desires and interests of the individual to the needs of the service." *Orloff* v. *Willoughby,* 345 U. S. 83, 92 (1953). For the first four weeks of the program the recruit must remain on the base. The military interest in preserving a relatively isolated sanctuary during this period justifies the limited restraints placed upon distribution of literature. Although the recruits may be exposed through the media and, perhaps, the mail to all views in civilian circulation, face-to-face persuasion by someone who urges, say, refusal to obey a superior officer's command, has an immediacy and impact not found in reading papers and watching television.

As the Court points out, there is no occasion to consider whether the regulation has been misapplied—or whether there are adequate procedural safeguards in the case of an adverse decision—for the noncandidate respondents have made no effort to obtain approval.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs, dissenting.

Only four years ago, in a summary decision that presented little difficulty for most Members of this Court, we held that a peaceful leafleteer could not be excluded from the main street of a military installation to which the civilian public had been permitted virtually unrestricted access. Despite that decision in *Flower* v. *United States,* 407 U. S. 197 (1972), the Court today denies access to those desirous of distributing leaflets and holding a political rally on similarly unrestricted streets and parking lots of another military base. In so doing, the Court attempts to distinguish *Flower* from this case. That attempt is wholly unconvincing, both on the facts and in its rationale. I, therefore, dissent.

According to the Court, the record here is "indispu-

tably to the contrary" of that in *Flower*. *Ante*, at 837.[1] But in *Flower*, this Court relied on the following characterization of Fort Sam Houston—the military fort involved there—and its main street in holding that a peaceful leafleteer could not be excluded from that street.

> " 'There is no sentry post or guard at either entrance or anywhere along the route. Traffic flows through the post on this and other streets 24 hours a day. A traffic count conducted on New Braunfels Avenue on January 22, 1968, by the Director of Transportation of the city of San Antonio, shows a daily (24-hour) vehicular count of 15,110 south of Grayson Street (the place where the street enters the post boundary) and 17,740 vehicles daily north of that point. The street is an important traffic artery used freely by buses, taxi cabs and other public transportation facilities as well as by private vehicles, and its sidewalks are used extensively at all hours of the day by civilians as well as by military personnel. Fort Sam Houston was an open post; the street, New Braunfels Avenue, was a completely open street.' " 407 U. S., at 198, quoting *United States* v. *Flower*, 452 F. 2d 80, 90 (CA5 1971) (Simpson, J., dissenting).

---

[1] In support of its characterization of the record as "indisputably to the contrary," the Court points to the Fort commander's response to respondent Spock's initial request to campaign at the Fort. *Ante*, at 837 n. 7. According to the Court, the commander's refusal to permit Spock's rally indicated that the military authorities had not " 'abandoned any claim [of] special interests in who walks, talks, or distributes leaflets . . . .' " See *ante*, at 837, quoting *Flower* v. *United States*, 407 U. S., at 198. The commander's response, however, came subsequent to a history of unimpeded civilian access to Fort Dix. Thus its after-the-fact, self-serving nature no more supports the assertion that the military authorities had not "abandoned any claim" than did the arrest of the defendant in *Flower*.

Fort Dix, at best, is no less open than Fort Sam Houston. No entrance to the Fort is manned by a sentry or blocked by any barrier. The reservation is crossed by 10 paved roads, including a major state highway. Civilians without any prior authorization are regular visitors to unrestricted areas of the Fort or regularly pass through it, either by foot or by auto, at all times of the day and night. Civilians are welcome to visit soldiers and are welcome to visit the Fort as tourists. They eat at the base and freely talk with recruits in unrestricted areas. Public service buses, carrying both civilian and military passengers, regularly serve the base. A 1970 traffic survey indicated that 66,000 civilian and military vehicles per day entered and exited the Fort. Indeed, the reservation is so open as to create a danger of muggings after payday and a problem with prostitution. There is, therefore, little room to dispute the Court of Appeals' finding in this case that "Fort Dix, when compared to Fort Sam Houston, is *a fortiori* an open post." *Spock* v. *David,* 469 F. 2d 1047, 1054 (CA3 1972). See Appendix to this opinion for photographic comparison of both forts.

The inconsistent results in *Flower* and this case notwithstanding, it is clear from the rationale of today's decision that despite *Flower* there is no longer room, under any circumstance, for the unapproved exercise of public expression on a military base. The Court's opinion speaks in absolutes, exalting the need for military preparedness and admitting of no careful and solicitous accommodation of First Amendment interests to the competing concerns that all concede are substantial. It parades general propositions useless to precise resolution of the problem at hand. According to the Court, "it is 'the primary business of armies and navies to fight or be ready to fight wars should the occasion arise,' *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 17," *ante,* at 837–838,

and "it is consequently the business of a military installation like Fort Dix to train soldiers, not to provide a public forum," *ante,* at 838. But the training of soldiers does not as a practical matter require exclusion of those who would publicly express their views from streets and theater parking lots open to the general public. Nor does readiness to fight require such exclusion, unless, of course, the battlefields are the streets and parking lots, or the war is one of ideologies and not men.

With similar unenlightening generality, the Court observes: "One of the very purposes for which the Constitution was ordained and established was to 'provide for the common defence,' and this Court over the years has on countless occasions recognized the special constitutional function of the military in our national life, a function both explicit and indispensable." *Ante,* at 837. But the Court overlooks the equally, if not more, compelling generalization that—to paraphrase the Court—one of the very purposes for which the First Amendment was adopted was to "secure the Blessings of Liberty to ourselves and our Posterity," [2] and this Court over the years has on countless occasions recognized the special constitutional function of the First Amendment in our national life, a function both explicit and indispensable.[3] Despite the Court's oversight, if the recent lessons of history mean anything, it is that the First Amendment does not evaporate with the mere intonation of interests such as national defense, military necessity, or domestic security.

---

[2] U. S. Const., Preamble. See also U. S. Const., Amdt. 1.

[3] See, *e. g., Buckley* v. *Valeo, ante,* p. 1; *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546 (1975); *New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Cohen* v. *California,* 403 U. S. 15 (1971); *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624 (1943); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931).

Those interests "cannot be invoked as a talismanic incantation to support any exercise of . . . power." *United States* v. *Robel,* 389 U. S. 258, 263 (1967).[4] See *New York Times Co.* v. *United States,* 403 U. S. 713 (1971). In all cases where such interests have been advanced, the inquiry has been whether the exercise of First Amendment rights necessarily must be circumscribed in order to secure those interests.

This principle was reaffirmed as recently as *Buckley* v. *Valeo, ante,* p. 1, where we permitted significant interference with First Amendment freedoms in order to secure this country's eminent interest in the integrity of the political process. But even there, we required the employment of "means closely drawn to avoid unnecessary abridgment." *Ante,* at 25. This requirement was cogently expressed and supported by MR. CHIEF JUSTICE BURGER, writing separately in *Buckley:*

> "We all seem to agree that whatever the legitimate public interests in this area, proper analysis requires us to scrutinize the precise means employed to implement that interest. The balancing test used by the Court requires that fair recognition be given to competing interests. With respect, I suggest the Court has failed to give the traditional standing to some of the First Amendment values at stake here.

[4] Indeed, as Mr. Chief Justice Warren observed in invalidating a portion of the Subversive Activities Control Act of 1950 as an unconstitutional abridgment of the First Amendment right of association:

"[T]his concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile." *United States* v. *Robel,* 389 U. S., at 264.

Specifically, it has failed to confine the particular exercise of governmental power within limits reasonably required.

" 'In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.' *Cantwell* v. *Connecticut,* 310 U. S. 296, 304 (1940).

" 'Unduly' must mean not more than necessary, and until today, the Court has recognized this criterion in First Amendment cases:

" 'In the area of First Amendment freedoms government has the duty to confine itself to *the least* intrusive regulations which are adequate for the purpose.' *Lamont* v. *Postmaster General,* 381 U. S. 301, 310 (1965) (BRENNAN, J., concurring). (Emphasis added.)

"Similarly, the Court has said:

" '[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.' *Shelton* v. *Tucker,* [364 U. S. 479, 488 (1960) (STEWART, J.)]." *Ante,* at 238–239 (concurring and dissenting).

Similarly, in *United States* v. *United States District Court,* 407 U. S. 297 (1972), this Court held that the concededly legitimate Government need to safeguard domestic security through wiretapping did not *ipso facto* vitiate protections vouchsafed by the Fourth Amendment, especially because such surveillance posed a threat to First Amendment interests. In particular, we held:

"As the Fourth Amendment is not absolute in its

terms, our task is to examine and balance the basic values at stake in this case: the duty of Government to protect the domestic security, and the potential danger posed by unreasonable surveillance to individual privacy and free expression. If the legitimate need of Government to safeguard domestic security requires the use of electronic surveillance, the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. *We must also ask whether a warrant requirement would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it.*" *Id.,* at 314–315 (emphasis supplied).[5]

---

[5] The Court went on to observe and conclude:

"These contentions in behalf of a complete exemption from the warrant requirement, when urged on behalf of the President and the national security in its domestic implications, merit the most careful consideration. We certainly do not reject them lightly, especially at a time of worldwide ferment and when civil disorders in this country are more prevalent than in the less turbulent periods of our history. There is, no doubt, pragmatic force to the Government's position.

"But we do not think a case has been made for the requested departure from Fourth Amendment standards. . . . We recognize, as we have before, the constitutional basis of the President's domestic security role, but we think it must be exercised in a manner compatible with the Fourth Amendment. In this case we hold that this requires an appropriate prior warrant procedure.

.        .        .        .        .

"Thus, we conclude that the Government's concerns do not justify departure in this case from the customary Fourth Amendment requirement of judicial approval prior to initiation of a search or surveillance. Although some added burden will be imposed upon the Attorney General, this inconvenience is justified in a free society to protect constitutional values. Nor do we think the Government's

If such is the necessary inquiry in the face of a critical Government interest where the First Amendment is only indirectly implicated, then no less careful an inquiry is compelled in this case where the First Amendment is directly implicated and the Government interest is no more important.

Finally, in *Pell* v. *Procunier,* 417 U. S. 817 (1974), this Court required that even in penal institutions "First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system." *Id.,* at 822. Accordingly, the Court did not abandon extensive analysis of the need for the restrictive prison regulation challenged there, even though "central to all other corrections goals [was] the institutional consideration of internal security within the corrections facilities themselves." *Id.,* at 823. Today, however, the Court gives no consideration to whether it is actually necessary to exclude all unapproved public expression from a military installation under all circumstances and, more particularly, whether exclusion is required of the expression involved here. It requires no careful composition of the interests at stake. Yet, as the Court also observed in *Pell,* "[c]ourts cannot . . . abdicate their constitutional responsibility to delineate and protect fundamental liberties." *Id.,* at 827. First Amendment principles especially demand no less.[6]

---

domestic surveillance powers will be impaired to any significant degree. . . ." 407 U. S., at 319–321.

[6] The concurring opinion of my Brother POWELL properly recognizes at least the need for careful inquiry in such cases. But I completely disagree with his characterization of the need to secure the Government's interest in a politically neutral military as an interest protected by prohibiting conduct of "symbolic incompatibility" with a military base. *Ante,* at 844. I gather that by this notion of "symbolic incompatibility," my Brother POWELL means only to accord recognition to the interest in neutrality, an interest qualitatively different from the more immediate functional interest

True to these principles and unlike the Court's treatment of military interests, respondents' position is not that the First Amendment is unbending.  Contrary to the intimations of today's decision, they do not contend that "[t]he guarantees of the First Amendment . . . [mean] 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.' "  *Ante,* at 836. Respondents Spock and Hobson's initial letter to the Fort Dix commander indicating their intent to campaign on the base also indicated in unequivocal terms their willingness to confine the rally to such times and places as might reasonably be designated by petitioners.[7]  The

---

in training recruits.  I, of course, have no quarrel with recognition of the interest.  See *infra,* at 867.  But that recognition as articulated by my Brother POWELL is so devoid of limiting principle as to contravene fundamentals of First Amendment jurisprudence.  This Court many times has held protected by the First Amendment conduct which was "symbolically incompatible" with the activity upon which it impacted.  See *Spence* v. *Washington,* 418 U. S. 405 (1974); *Procunier* v. *Martinez,* 416 U. S. 396 (1974); *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624 (1943).  Indeed, the very symbolisms of many of our institutions have been the subject of criticisms held to be unassailably protected by the First Amendment.

[7] Spock and Hobson's letter, dated September 9, 1972, stated in pertinent part:

"As presidential and vice-presidential candidates, we intend to visit Fort Dix to campaign among the servicemen and servicewomen there.  Both the Peoples Party and the Socialist Workers Party are addressing themselves to the special issues facing U. S. soldiers. For this reason we are bringing our respective campaigns wherever possible directly to the American G. I.

"The recent decision allowing G. I.'s stationed in New Jersey to register and vote there will undoubtedly result in an increased number of registered voters at the base, and an increased interest in the presidential contest.  For that reason we are especially looking forward to campaigning at Fort Dix.

"It is not our intention to disrupt the normal functioning of the base

other respondents sought only to distribute leaflets in unrestricted areas. And, contrary to further intimations by today's decision, respondents do not go so far as to contend, nor did the Court of Appeals think, that "whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment," *ante,* at 836, or that "federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens," *ante,* at 838. Respondents carefully and appropriately distinguish between a military base considered as a whole and those portions of a military base open to the public.[8] And not only do respondents not go so far as to contend that open places constitute a "public forum,"[9] but also they need not go so far. *Flower* never went so far as to find that Fort Sam Houston or its public streets were a public forum. Moreover, the determination that a locale is a "public forum" has never been erected as an absolute prerequisite to all forms of demonstrative First Amendment activity. In short, then, today's decision only serves to answer a set of broad, falsely formulated issues, and fails to provide the careful consideration of interests deserved by the First Amendment.

---

and we will of course abide by any reasonable restrictions as to the time and places of our campaigning. Perhaps you would like to furnish us with a meeting hall or other such facility while we are on the post, where we might address interested soldiers. We will want to distribute our literature and talk to the soldiers about the issues that concern them.

"Our visit will take place on September 23, from about 10:30 A. M. to 2:00 P. M. If you have any questions concerning our plans, please contact us through our campaign offices." 1 App. 12–13.

[8] Brief for Respondents 23, 25–26.

[9] See *id.,* at 25–26.

It bears special note that the notion of "public forum" has never been the touchstone of public expression, for a contrary approach blinds the Court to any possible accommodation of First Amendment values in this case. In *Brown* v. *Louisiana*, 383 U. S. 131 (1966), for example, the First Amendment protected the use of a public library as a site for a silent and peaceful protest by five young black men against discrimination. There was no finding by the Court that the library was a public forum. Similarly, in *Edwards* v. *South Carolina*, 372 U. S. 229 (1963), the First Amendment protected a demonstration on the grounds of a state capitol building. Again, the Court never expressly determined that those grounds constituted a public forum. And in *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503 (1969), the First Amendment shielded students' schoolroom antiwar protest, consisting of the wearing of black armbands.[10] Moreover, none of the opinions that have expressly characterized locales as public forums has really gone that far, for a careful reading of those opinions reveals that their characterizations were always qualified, indicating that not every conceivable form of public expression would be protected. See *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546 (1975); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972); *Cox* v. *New Hampshire*, 312 U. S. 569 (1941); *Hague* v. *CIO*, 307 U. S. 496 (1939).

Those cases permitting public expression without characterizing the locale involved as a public forum, together with those cases recognizing the existence of a public forum, albeit qualifiedly, evidence the desirability of a

[10] Significantly, the Court observed in *Tinker*: "There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." 393 U. S., at 508.

flexible approach to determining when public expression should be protected. Realizing that the permissibility of a certain form of public expression at a given locale may differ depending on whether it is asked if the locale is a public forum or if the form of expression is compatible with the activities occurring at the locale, it becomes apparent that there is need for a flexible approach. Otherwise, with the rigid characterization of a given locale as not a public forum, there is the danger that certain forms of public speech at the locale may be suppressed, even though they are basically compatible with the activities otherwise occurring at the locale.

Not only does the Court's forum approach to public speech blind it to proper regard for First Amendment interests, but also the Court forecloses such regard by studied misperception of the nature of the inquiry required in *Flower*. In particular, this Court found controlling in *Flower* the determination that the military command of Fort Sam Houston had "abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue." 407 U. S., at 198. That was to say, that the virtually unrestricted admission of the public to certain areas of the Fort indicated that an exercise of public expression in those areas, such as distributing pamphlets, would not interfere with any military interests. Absent any interference, there could be no justification for selectively excluding every form of public expression, particularly a form no more disruptive than the civilian traffic already permitted. The abandonment required by *Flower* was not tantamount to a wholesale abdication of control, but rather was the yielding of base property to a use with which the exercise of the challenged form of public expression was not inconsistent. Thus, contrary to the Court's inaccurate reformulation, *Flower* did not go so far as to require

that the military "[abandon] any right to exclude civilian vehicular and pedestrian traffic," *ante,* at 835, or "[abandon] any claim of special interest in regulating" public expression before such expression would be permitted, *ante,* at 837. The military certainly could retain the right to exclude civilian traffic, but it could not choose freely to admit all such traffic save for the traffic in ideas. And the military certainly could retain an interest in reasonably regulating, but not in absolutely excluding, public expression. The Government does have the power "to preserve the property under its control for the use to which it is lawfully dedicated," *Adderley* v. *Florida,* 385 U.S. 39, 47 (1966) (quoted *ante,* at 836), provided the property remains so dedicated.

As applied in this case, the foregoing considerations require that the leaflet-distribution activities proposed by respondents be permitted in those streets and lots unrestricted to civilian traffic. Those areas do not differ in their nature and use from city streets and lots where open speech long has been protected. *Hague* v. *CIO, supra,* at 515. There is no credible claim here that distributing leaflets in those areas would impair to any significant degree the Government's interests in training recruits or, broadly, national defense.[11] See *United States* v. *United States District Court,* 407 U. S., at 321. This case, therefore, is unlike *Adderley* v. *Florida, supra.* There, though this Court held that the First Amendment did not protect a civil rights demonstration con-

---

[11] The only threat to their "mission" that military officials were able to articulate consisted of concerns that distributing leaflets or having a rally could possibly create crowds, engender partisan discussion, start an argument, or incite riots. *E. g.,* 1 App. 43–46, 48–49, 50–51, 64. "But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker* v. *Des Moines School Dist.,* 393 U. S., at 508.

ducted on a jailhouse driveway, the Court was careful to observe that the "particular jail entrance and driveway were not normally used by the public," 385 U. S., at 45, and that the jail custodian "objected only to [the demonstrators'] presence on that part of the jail grounds reserved for jail uses," *id.*, at 47.

Unlike distributing leaflets, political rallies present some difficulty because of their potential for disruption even in unrestricted areas. But that a rally is disruptive of the usual activities in an unrestricted area is not to say that it is necessarily disruptive so as significantly to impair training or defense, thereby requiring its prohibition. Additionally, this Court has recognized that some quite disruptive forms of public expression are protected by the First Amendment. See *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940). In view of respondents' willingness to submit to reasonable regulation as to time, place, and manner, it hardly may be argued that Fort Dix's purpose was threatened here. Without more, it cannot be said that respondents' proposed rally was impermissible.

It is no answer to say that the commander of a military installation has the "historically unquestioned power . . . to exclude civilians from the area of his command." *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U. S. 886, 893 (1961). The Court's reliance on this proposition from *Cafeteria Workers* is misplaced. That case was only concerned with the procedural requisites for revocation of a security clearance on a military base, not with the range of permissible justifications for such revocation and, thereby, exclusion. Indeed, the "privilege" doctrine upon which rested the sweeping powers suggested by that case has long since been repudiated. *Board of Regents* v. *Roth,* 408 U. S. 564 (1972). But more important. that decision specifically recognized that

the Government was constrained by specific constitutional limitations, even in the exercise of its proprietary military functions. 367 U. S., at 897. Where the interference with Fort functions by public expression does not differ from that presented by other activities in unrestricted areas, the Fort command may no more preclude such expression, than " 'Congress may . . . "enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office." ' " *Ibid.*, quoting *United Public Workers* v. *Mitchell*, 330 U. S. 75, 100 (1947).

Similarly, it is no answer to say that the proposed activities in this case may be excluded because similar forms of expression have been evenhandedly. excluded. An evenhanded exclusion of all public expression would no more pass constitutional muster than an evenhanded exclusion of all Roman Catholics. In any event, there can be no assertion that evenhanded exclusion here has in fact been the case because, as the Court implicitly concedes, *ante,* at 839, there have been no other instances where the privilege of engaging in public expression on the Fort was advanced.

Additionally, prohibiting the distribution of leaflets cannot be justified on the ground that that expression presents a "clear danger to [military] loyalty, discipline, or morale." *Ante,* at 840. This standard for preclusion is, in the face of a well-developed line of precedents, constitutionally inadequate. This Court long ago departed from "clear and present danger" as a test for limiting free expression. See *Hess* v. *Indiana,* 414 U. S. 105 (1973); *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969); *Edwards* v. *South Carolina, supra; Scales* v. *United States,* 367 U. S. 203 (1961); *Yates* v. *United States,* 354 U. S. 298 (1957); *Dennis* v. *United States,* 341 U. S. 494 (1951). Yet the Court today, without reason, would fully reinstate that test and, indeed, would only require that the danger be clear, not even present. *Ante,* at

840. As Mr. Justice Holmes observed in dissent better than a half century ago: "It is only the present danger of immediate evil or an intent to bring it about that warrants . . . setting a limit to the expression of opinion." *Abrams* v. *United States,* 250 U. S. 616, 628 (1919). "Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrants making any exception to the [First Amendment]." *Id.,* at 630–631. Accepting for the moment, however, the validity of a "clear danger" test, I do not see, nor does the Court's opinion demonstrate, how a clear danger is presented in this case. No one has seriously contended that the activities involved here presented such a danger to military loyalty, discipline, or morale.

The response that no such showing was required in this case because respondents failed to furnish for prior approval the material they proposed for distribution will not suffice.[12] I first note that in view of the Court's essentially blanket preclusion of public expression from military installations, it is unnecessary for the Court

---

[12] The Court further observes that the noncandidate respondents were also "excluded from Fort Dix because they had previously distributed literature there without even attempting to obtain approval for the distribution." *Ante,* at 840. This justification is wholly inadequate. It assumes that prior approval could have been validly required the first time respondents were excluded. As argued in the text, this page and 865–866, that assumption is incorrect. But even if it is correct, failure once to have sought approval clearly may not of itself justify exclusion when approval is sought on a subsequent occasion. First, 18 U. S. C. § 1382 only prohibits *unapproved* re-entry of those who have once been excluded from a military base; it does not give a base commander warrant for excluding such individuals on all future occasions. Second, if the activity for which those individuals seek subsequent approval is protected by the First Amendment, the fort commander may no more disapprove that activity because of the past transgression, than prohibit a person once convicted of selling obscene material from future sales of Lady Chatterley's Lover.

to reach this issue—save to the extent the Court unwittingly concedes the tenuousness of its total ban. *Alexander* v. *Louisiana,* 405 U. S. 625 (1972); *Ashwander* v. *TVA,* 297 U. S. 288, 346–348 (1936) (Brandeis, J., concurring). See *Rescue Army* v. *Municipal Court,* 331 U. S. 549 (1947). Most important, however, in advancing such a justification, the Court engages in a rude refusal even to acknowledge the firmly fixed limitation on governmental control of First Amendment activity afforded by the doctrine against prior restraints. The illegality of the restraint sought to be imposed in this case obviated any requirement that respondents submit to it, thereby risking irreparable injury to First Amendment interests. See *New York Times Co.* v. *United States,* 403 U. S., at 725–726, and n. (1971) (BRENNAN, J., concurring); *Freedman* v. *Maryland,* 380 U. S. 51 (1965).

Requiring prior approval of expressive material before it may be distributed on base constitutes a system of prior restraint,[13] *Freedman* v. *Maryland, supra; Times Film Corp.* v. *Chicago,* 365 U. S. 43 (1961); a system "bearing a heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S., at 558; *New York Times Co.* v. *United States, supra,* at 714; *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 716 (1931). "Our distaste for censorship—reflecting the natural distaste of a free people—is deep-written in our law." *Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 553. The Court's tacit approval of the prior restraint imposed under Fort Dix Reg. 210–27 is therefore deeply disturbing. Not only does the Court approve a procedure whose validity need not even be considered in this case, but also it requires no rebuttal of the heavy presumption against

---

[13] Where a demonstrator seeks use of an area serving an inconsistent use, however, the restraint then permissible is, of course, not only prior, but absolute.

that validity. And I seriously doubt that the presumption would fall in this case.

First, while not every prior restraint is *per se* unconstitutional, the permissibility of such restraints has thus far been confined to a limited number of contexts. *Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 559. The imposition of prior restraints on speech or the distribution of literature in public areas has been consistently rejected, except to the extent such restraints sought to control time, place, and circumstance rather than content. See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Hague* v. *CIO,* 307 U. S. 496 (1939); *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938). Similarly, the content-oriented prior restraint of Reg. 210–27 has no place in the open areas of Fort Dix.

Second, "[t]he settled rule is that a system of prior restraint 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" *Southeastern Promotions, Ltd.* v. *Conrad, supra,* at 559, quoting *Freedman* v. *Maryland, supra,* at 58. But neither Fort Dix regulations nor any other applicable Army or Department of Defense guidelines require a prompt determination that publications may be distributed on the Fort. At the very least, therefore, there should be a requirement that the Fort commander promptly approve or disapprove publications proposed for distribution, lest failure to make a determination effectively result in censorship. See *Blount* v. *Rizzi,* 400 U. S. 410 (1971); *Southeastern Promotions, Ltd.* v. *Conrad, supra; Freedman* v. *Maryland, supra.*

The Court's final retreat in justifying the prohibitions upheld today is the principle of military neutrality. According to the Court, the military authorities of Fort Dix were free to pursue "the American constitutional tra-

dition of a politically neutral military." *Ante,* at 839. I could not agree more that the military should not become a political faction in this country. It is the lesson of ancient and modern history that the major socially destabilizing influence in many European and South American countries has been a highly politicized military. But it borders on casuistry to contend that by evenhandedly permitting public expression to occur in unrestricted portions of a military installation, the military will be viewed as sanctioning the causes there espoused.[14] If there is any risk of partisan involvement, real or apparent, it derives from the exercise of a choice, in this case, the Fort commander's choice to exclude respondents, while, for example, inviting speakers in furtherance of the Fort's religious program.[15] Additionally, the Court would do well to consider the very real system of prior restraint operative at Fort Dix, for the very fact that literature distributed on the Fort is subject to that system fosters the impression that it is disseminated with a military imprimatur.

---

[14] As I observed in dissenting from this Court's decision upholding the preclusion of political, but not commercial, advertisement from municipally run buses:

" 'The endorsement of an opinion expressed in an advertisement on a motor coach is no more attributable to the transit district than the view of a speaker in a public park is to the city administration or the tenets of an organization using school property for meetings is to the local school board.' *Wirta* v. *Alameda-Contra Costa Transit District,* 68 Cal. 2d 51, 61, 434 P. 2d 982, 989 (1967). The city has introduced no evidence demonstrating that its rapid transit passengers would naively think otherwise. And though there may be 'lurking doubts about favoritism,' *ante,* at 304, the Court has held that '[n]o such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case.' *Williams* v. *Rhodes,* 393 U. S., at 33." *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 321 (1974).

[15] 1 App. 54–55.

More fundamentally, however, the specter of partiality does not vanish with the severing of all partisan contact. It is naive to believe that any organization, including the military, is value neutral. More than this, where the interests and purpose of an organization are peculiarly affected by national affairs, it becomes highly susceptible of politicization. For this reason, it is precisely the nature of a military organization to tend toward that end.[16] That tendency is only facili-

---

[16] The testimony in the District Court of the officer representing the commanding officer of Fort Dix is exemplary:

"Q  I see. Well, doesn't the war with Vietnam deal with your mission?

"A  Oh, yes.

"Q  Well, what I guess I am trying to get at is isn't it true that the content of what a proposed visitor intends to say is the basis for whether he is allowed to come on or not? If, for instance, he says 'I intend to urge the soldiers not to use drugs,' that, from what you have said, would be something that the Base might favorably look on. If he is going to inform them of some management principle that they are not aware of—

"A  That would further our mission, yes.

"Q  But if they are to speak against the war in Vietnam—

"A  That certainly wouldn't forward our mission, would it?

"Q  So the content of what they are to say, that is the basis of whether or not they are approved?

"A  Yes, to a great extent." 1 App. 64.

"It appears highly likely . . . that the military in the post-Vietnam period will increasingly diverge along a variety of dimensions from the mainstream of developments in the general society." Moskos, Armed Forces and American Society: Convergence or Divergence?, in Public Opinion and the Military Establishment 271, 277 (C. Moskos ed. 1971). "[T]he military is undergoing a fundamental turning inward in its relations to the civilian structures of American society." *Ibid.*

"[T]he probability of sustained internal agitation or even questioning of the military system is unlikely once the war in Southeast Asia ends. With the advent of a curtailed draft or all-volunteer force, the military will find its membership much more

tated by action that serves to isolate the organization's members from the opportunity for exposure to the moderating influence of other ideas, particularly where, as with the military, the organization's activities pervade the lives of its members. For this reason, any unnecessary isolation only erodes neutrality and invites the danger that neutrality seeks to avoid.

In *Hudgens* v. *NLRB, ante,* p. 507, as in today's decision, this Court recently moved to narrow the opportunities for free expression in our society. In *Hudgens,* the Court also preached of its institutional duty to declare overruled a case whose rationale did not survive that of a succeeding case. I would maintain that the Court's duty is to recognize the irreconcilability of two decisions and then to explain why it chooses one over the other. But accepting for the moment the Court's perception of its duty, I note that the Court today declines to overrule *Flower.* I presume, therefore, that some meaningful distinction must exist between that decision and today's. But if any significant distinction remains between the cases, it is that in *Flower* the private party was an innocuous leafleteer and here the private parties include one of this country's most vociferous opponents of the exercise of military power.[17] That

---

acquiescent to established procedures and organizational goals. Without broadly based civilian representation, the leavening effect of recalcitrant servicemen—drafted enlisted men and ROTC officers—will be no more. It appears that while our civilian institutions are heading toward more participative definition and control, the post-Vietnam military will follow a more conventional and authoritarian social organization. . . ." *Id.,* at 292.

[17] My Brother POWELL's concurrence correctly so highlights this case: "Traditionally, candidates for office have observed scrupulously the principle of a politically neutral military and have not sought to identify or canvass a 'military vote.'" *Ante,* at 846. I do not believe, however, that the principle of military neutrality goes so

is hardly a distinction upon which to render a decision circumscribing First Amendment protections.

I would, for these reasons, affirm the judgment of the Court of Appeals.

---

far as to control the content or the audience of address of political speech. And I can think of no poorer warrant for abridging the values protected by the First Amendment than tradition. The principle of military neutrality is concerned, not with precluding exposure of the military to political issues, but with preventing the military from becoming a political faction by its very isolation from political discourse or selective exposure to such discourse. See n. 16, *supra*. To be sure, "[a]lthough the recruits may be exposed through the media and, perhaps, the mail to all views in civilian circulation, face-to-face persuasion by someone who urges, say, refusal to obey a superior officer's command, has an immediacy and impact not found in reading papers and watching television." *Ante*, at 849. But there is here no allegation of such an immediate threat to base order. Nor do I perceive any basis for properly imputing the threat of such illegal conduct to respondent Spock or any of the other respondents.

APPENDIX TO OPINION OF BRENNAN, J.,
DISSENTING

"Visitors Welcome" sign on roadside adjacent to New Jersey Route 68 entrance to Fort Dix.

Main entrance to Fort Sam Houston in *Flower* (arrow indicates sidewalk on which defendant was arrested).

Respondents Ginaven and Misch distributing pamphlets, just prior to their arrest, inside Wrightstown, N. J., entrance to Fort Dix.

MR. JUSTICE MARSHALL, dissenting.

While I concur fully in MR. JUSTICE BRENNAN's dissent, I wish to add a few separate words. I am deeply concerned that the Court has taken its second step in a single day toward establishing a doctrine under which any military regulation can evade searching

constitutional scrutiny simply because of the military's belief—however unsupportable it may be—that the regulation is appropriate. We have never held—and, if we remain faithful to our duty, never will hold—that the Constitution does not apply to the military. Yet the Court's opinions in this case and in *Middendorf* v. *Henry,* 425 U. S. 25, holding the right to counsel inapplicable to summary court-martial defendants, go distressingly far toward deciding that fundamental constitutional rights can be denied to both civilians and servicemen whenever the military thinks its functioning would be enhanced by so doing.

The First Amendment infringement that the Court here condones is fundamentally inconsistent with the commitment of the Nation and the Constitution to an open society. That commitment surely calls for a far more reasoned articulation of the governmental interests assertedly served by the challenged regulations than is reflected in the Court's opinion. The Court, by its unblinking deference to the military's claim that the regulations are appropriate, has sharply limited one of the guarantees that makes this Nation so worthy of being defended. I dissent.